I appreciate the opportunity to argue this case before a panel that has some history in it. These cases can oftentimes get rather complicated. And our initial order in this case was back in 2006. Was it not? Yes. All right. You know, these sometimes in these types of cases, I feel a little more like a detective than an attorney. Following evidence trails of generally scientific evidence throughout the litigation in an attempt and sort of maneuvering my way through a Byzantine administrative record and trying to finally uncover some semblance of truth. And well, counsel, let me ask you a threshold question. There seems to be some concern, it was echoed in Judge Malloy's order, that you did not give him an opportunity to get to the merits of some of these issues that you just sort of mentioned them in passing. Do you have a response on that? Do you have any observations that would help us decide whether or not some of these claims have been waived? I definitely haven't waived any of the claims that I'll be arguing today. I'm sorry? We definitely have not waived any of the claims that we'll be arguing today. It's sort of a common issue that comes up in these cases, I think, which is probably more emblematic of judicial frustration over dealing with these sort of administrative record cases than anything else. You know, our arguments and the issues that we've raised have not changed from the moment we first commented on the proposal before I was involved and at the administrative phase. But the administrative record comes into the litigation, and then there's responsive briefing. And it would be nice if we actually had the luxury of time before arguing these cases to sit down and review 20,000 pages of administrative record, but it's not practical. Well, why don't you get to the merits of your appeal, then? You have five issues that I'm aware of. Did the Forest Service irretrievably commit resources? Did it meet the requirements for public collaboration? And then some of the questions as to whether there was compliance with NEPA and the NFMA on soil analysis and old growth and species. What is your principal argument on appeal? The arguments I would like to focus on today have to do with the two central issues before the Court. And the two main issues with the public. And both of these issues have one thing in common, Your Honor. Which are those? That the Forest Service misrepresented and misapplied the science in reaching its decision to log. And as it is the issue of most concern with the public, I'll begin with the old growth issue. And in that case, the record clearly shows that the Forest Service, in removing protections from old growth habitat, misapplied and misrepresented the very criteria that they have relied upon throughout this process to insist that old growth habitat levels are not an issue, that it's outside the scope of concern with this project. Specifically, the Forest Service relied on the regional criteria, which is a scientific document commonly referred to as GREEN, which was its main author. And the green criteria basically provide a catalog of old growth criteria for different tree species in the northern Rockies, even all the way down to detail for each specific forest. And green is good science. We have no problem with green. However, if you read green carefully, he cautions against using the criteria listed therein in exactly the way the Forest Service has done in this case. Green says, and I'm quoting, because of the great variation in old growth structures over time, no set of numbers can be relied upon to correctly classify every stand. And therefore, Green says, a stand should not be accepted or rejected as old growth simply on the basis of associated characteristics. He goes on to say that the number of trees is meant as a guideline for how many trees it takes to produce older stand characteristics and should not be used as an absolute. In this case, the Forest Service took those same criteria and said, the minimum criteria require that a stand have a certain number of large old trees. In other words, that those numbers are absolute. And accordingly, it misapplied that by saying, for instance, where a previously designated long inhabited old growth stand was found by selective surveys to have 7.97 live old trees per acre instead of 8.0. They removed the designation from that stand and insist to this court, there's absolutely no old growth habitat left in that stand because it's .03, one hundredths of a tree per acre below the number. Now, what's our standard of review at this stage? This is a NEPA argument, right? This is a NEPA argument because scientific integrity is the foundation of NEPA. Congress directed and the American public can presume that the Forest Service, as the managers of our forests, the designated agency for implementing these laws is going to accurately represent and apply science and not intentionally try to mislead the public in matters of great import, such as protecting centuries old habitat, especially in an area like the Middle East for which is already deficient in that habitat below the minimum standards in the forest plan. So for the for the Forest Service, then, to say that these criteria are absolute. And as soon as we find an old growth stand falls below eight point zero trees per acre of a certain size and age, then we can go in and log it and remove snags and so forth. It's not good science. It's it's contrary to what the criteria state. And frankly, it does not support the contention that because there are seven point nine seven trees per acre instead of eight point zero, there's no old growth habitat, absolutely no old growth habitat. So therefore, they don't have to go out and figure out where, you know, if you have a three hundred acre stand, it could be that that the the reduced mortality is located peripherally and that on balance the stand is still good habitat. Well, I'm looking at the map in this excerpt record. There's a you probably looked at it. I couldn't see much evidence of any any substantial stand hold growth in that area. And that from an aerial map from an aerial view or. Well, from the from the color coding and so on on the map, it didn't look like a lot of that had been. So if you look at the photos that we've supplied you, your honor, that's classical growth habitat for the northern Rockies. They're large old trees. More importantly, what is the definition of old growth habitat? I mean, just think about this from a common sense standpoint. It's old. It's old for us. Over 200 years old. It looks like it's been pretty well. A lot of it's been logged off and a lot of some of it's been burned and some of it's built up. Exactly. Exactly. Most of this basin is deficient in old growth habitat. That's why it probably became so alarmed when the Forest Service removed protections from previously unlogged, undisturbed, centuries old forest that is probably an enclave or a last refuge for whatever old growth species still inhabit this valley. And remarkably, you know, the second definition of old growth habitat is that it's inhabited by old growth species. The Forest Service never bothered to go into these stands that they're removing protections from and actually survey the wildlife uses and habitation of those stands. That's why the last time I stood before you, we were like we were complaining that they told the public that every one of these stands they went into, they use an old growth wildlife habitat wildlife survey form. Well, the district judge said they did put boots on the ground and went in and looked over a lot of this terrain. It was it was he was addressing the soils issue in that regard, but they didn't do surveys of old growth habitat or old growth habitat habitation. In other words, there are sensitive species like the boreal owl or somebody going in there and marking save trees and and trees to go and. Checking of checking wildlife trees, old growth species depend on forests, not trees, your honor. You know, it's not a question of saving a few trees here and there. Is there any dispute about the variety of species there? There's some probably some pines, some fir, some maybe large. I don't know that neighborhood too well, but is there any dispute about the variety of species that are available there? There's some new growth. There's some reproduction going on, isn't there? Yeah. Old growth habitat tends to be complicated. So, you know, large standing dead trees and various ages in some of those various ages. Yeah. Yes. But the dispute is not over the trees, your honor. The dispute is over the habitat. They're saying even though these are centuries old trees that previously were designated and protected as old growth habitat, they're saying it's no longer old growth habitat. And they're saying that without bothering to survey, do wildlife surveys and find out if boreal owls, you know, flammulated owls, fishers, pine martins are still in there. Different kinds of woodpeckers and hawks. I don't recall anything specific about owls, but the rangers who go in there know what's in there. They don't have to write down every time they see a tree that has a nest in it or something. They know those trees. Well, if they know there's old growth species in there, then it's still old growth habitat. It's old growth species habitat. And they're obligated to protect that, especially in a basin like this. Well, where does the record say they're not going to protect the old growth habitat? They're logging it, your honor. This court dealt with the very same issue in the Ecology Center. Traditionally, the Forest Service logged old growth because those are the big money trees. Those are the ones that are most desirable. Are they clear-cutting particular areas that have mixed ages and mixed species in them? They're cutting. If they're not clear-cutting, how do you know they're logging old growth trees? They said they were. The main dispute in this case was at the administrative level was over legacy trees. The public, the plaintiffs or appellants in this case, all they wanted was assurances from the Forest Service that even when they went into these, you know, even though they objected to them going in and logging in these old growth enclaves, they just said don't take any trees over 20 inches and we'll be happy and I wouldn't be here. And the Forest Service advisor said no. He said 98% of the volume is not going to be coming from trees over 20, live trees over 20 inches, but he wouldn't agree to protect legacy trees. So those, you know, wolf trees are of particular value to old growth species. So the largest trees can be logged, but all they're saying is they will retain some of the larger trees over 20 inches. But it's going to be up, you know, largely up to the logger which ones are taken and which ones are left. But the bottom line is once you go into habitat like that, complex habitat like that, and start removing trees, reducing canopy closure, and, you know, taking away trees that would otherwise provide the complexity on the ground of dead wood. And so you're altering that habitat in a way that impacts species. And there's no dispute over that. And as this court said, and if there was sufficient old growth habitat in this area to ensure the viability of those species, then they could arguably do that with the appropriate analysis. But as this court recognized in the ecology center, they can't say, well, there's not enough old growth, and even though we're logging old growth, we're doing it in a way that's beneficial to old growth species, because the science simply doesn't support that. And they've never monitored the impacts of that type of logging in the past to prove it. So that is not an issue. What the Forest Service is saying here is that there is no old growth habitat that we're logging. And what the science says is that's not true. You can't say that without actually doing some surveys and showing that there's no old growth species in there, especially when this is formally protected and designated old growth habitat. It's not getting any younger, Your Honor. It's still old growth habitat. There are still old growth species there. And it's disingenuous for the Forest Service to rely on this type of creative accounting to say, oh, it's not old growth habitat. Do you think that once they remove those designations based on 7.97 trees per acre instead of 8.0, all the species left, that it's no longer old growth habitat because the Forest Service proclaimed it wasn't old growth habitat? Of course not. It's old growth habitat, and if they want to log it, then they have to prove that they're ensuring the viability of old growth species at a landscape level, and they refused to do that. They said it was outside the scope of the analysis in this project. Tell us about the marking. The Forest Service was supposed to mark or identify some of the trees that could not be taken. Is that correct? No, Your Honor. I believe they were marking the trees that were to be logged. I think they do both, but I'm not. As a general rule, they'll do both. Okay. But in the marking process, they segregate what can be cut and what cannot be cut. Isn't that true? It just depends, Your Honor. Sometimes they mark areas to be cut and leave it up to the loggers. Sometimes they mark specific trees that are to be logged. Sometimes they mark ñ it varies. Well, we're going to hear from the Forest Service in a moment, but it just occurs to me that we'll probably hear them say that they did take steps to protect old growth, and maybe you and they are disagreeing with respect to the adequacy or the policy choices that were being made and how to do it. Is that possible? No, we're disagreeing over the fact that they're not complying with Forest Plan old growth standards in this area because they've logged it too much in the past, and now they're going into the last remaining vestiges of old growth habitat, and they're logging those, and they refuse to analyze for, you know, prove that they're ensuring the viability of old growth species. Well, that pretty much sets up the argument. You have two and a half minutes left you may wish to reserve, or you can consume them. Well, let me just mention on the issue of soils that they also misrepresented the signs there, and the briefing certainly is adequate to point that out. The long-term soils productivity study from largely here in California and Arizona does not support the idea that there is non-detrimental soil disturbance in the northern Rockies. And more importantly, Your Honor, you know, that was the distinction, that use of that science was used to dismiss the concerns of the Bitterroots soil scientists, and his concerns were with cumulative effects of soils disturbance in basins, entire basins, that exceed the 15% threshold for detrimental disturbance, which is presumed in this region to be irreversible soils damage. The author of the standards themselves, Mr. Nesser, and the scientists from the Bitterroot National Forest both said that in these types of instances where there's already excessive soil damage over the threshold, that the effects of further damage needs to be analyzed in a cumulative way at a basin landscape level, and you can't just restrict your analysis to the particular cutting units that you're going in and logging. And that's what the Forest Service did here. So the Forest Service basically is saying they're not required to consider cumulative effects of soils damage, in spite of the language in the National Forest Management Act that says that in basins like these, And that's an issue of first impression in this court, Your Honor, because the Forest Service is saying that the Region I soil standards are themselves adequate to demonstrate compliance with that prohibition in NIFMA. This court has never had occasion to consider those standards before, and what the soil scientists from the Bitterroot and the author of those standards both recognize is that those standards do not address cumulative effects at the landscape level. Therefore, it's incumbent on the Forest Service to do so at the project level, and in this case, they refuse to do that. They say they're not required to do that by law, and that is a critical issue in this case of first impression because it would set a very disturbing precedent if they were allowed to just have that myopic of a focus in their analysis. Thank you, Counsel. Your time has expired. We'll hear from the, well, we've got co-counsel, whoever is going to go first. Good morning. May it please the Court, Stacy Person representing the Forest Service, and I will be taking 13 minutes today, and Julie Weiss, Counsel for Interveners, will be taking seven minutes. I'd just like to initially note on the issue of waiver. As the district court noted, Wild West waived its arguments on public participation in the process as well as the irretrievable commitment of resources issue. As we noted in our opening brief, Wild West has waived a facial challenge to this issue of the soil quality standards because Wild West did not raise that issue at all in the district court, and therefore the district court never addressed it. And also, Wild West has actually waived the issue raised in the reply brief on this appeal regarding population analysis. That was never something that was brought up in the opening brief, and the Forest Service has not had an opportunity to respond to it. With those things in mind, I'd like to give just a short bit of context. It's unclear as to the arguments that counsel did address to us on the old growth area. Yes. They haven't waived that. Old growth with respect to? As he's articulated it to us today. Well, you're not. The standard of 7.9, the green standard applied myopically. I do think that he's waived that issue. This has been a bit of a moving target. He addressed old growth concerns originally and asserted that the Forest Service had erred because it had used an imminently dead standard for assessing old growth and determining whether this was old growth habitat. He has now dropped that. I'm not sure if he recognizes the imminently dead standard was actually used in marking trees, not in identifying old growth. So Wild West seems to have dropped that issue and now instead is arguing that the Forest Service applied green and has no problem with green being applied but has a problem with the Forest Service's application of green. To this. To this. I would say that that argument has not been made before. Okay. Just to give a short bit of context, this appeal involves a hazardous fuel reduction project that was developed under the Healthy Forest Restoration Act. In enacting the Healthy Forest Restoration Act or the HFRA, Congress directed the Forest Service to implement projects to reduce hazardous fuels on federal land and wildland urban interface areas and in areas that have been hit by an insect epidemic, and that's precisely what the Forest Service has done here. The Forest Service, after an extensive public process, approved the Middle East Fork Project, and because the record shows that this project complies with both procedural and substantive environmental laws, the Forest Service's selection of the project was neither arbitrary nor capricious. So to address the issue of old growth, I'd like to address old growth, then a few comments on species viability, and then if the Court has any questions on the soil. Well, now, we're looking at this through an appeal of a NEPA claim, and so the standard of review is hard look. What's the standard of review that applies here? The standard of review is arbitrary or capricious, and so the Court is looking at whether the agency's application here was arbitrary or capricious. As to old growth, the first thing to keep in mind is that this project does not treat old growth habitat. In this case, it's readily distinguishable from Ecology Center versus Austin because of that fact. Now, is that, that's what I understood the debate to be between you and the appellant, but I've been a little confused by the argument, so I just want to make, and it's probably my fault, but I understood counsel to be arguing that you are saying there's no old growth because of this misapplication of the standard, that in fact there is old growth there. It's just you changed the designation, and therefore it's not, quote, old growth, when in fact if you applied the 8.0 standard, it would be old growth. It's not that there aren't old growth trees there. You just considered it not old growth. Well, Your Honor, old growth is not individual trees. I know. That's what he said. Old growth habitat is defined by minimum criteria in this green article, and the minimum criteria includes a number of factors, one of those being the number of live trees. Right. Other factors include age of trees in some instances, the height of trees, the crown ratio in the area. So what the Forest Service did here was they went out to every single stand. They went out on the ground multiple times in each stand, and oftentimes three times in 2004 and in 2005, and assessed the stands based on the minimum criteria in the green article. And that data is in the record. It's in the supplemental excerpts at 1282 to 1292. That's not the full ‑‑ the data is hundreds of pages long, so that's a representative sample of some of the data. Now, Mr. Woodbury expressed his concern that loggers have some freedom of action here to harvest old growth trees that may be in this area, which otherwise may or may not qualify for an old growth designation. Well, Your Honor, the Forest Service marks the trees that will be cut, and the marking guidelines reflect that the Forest Service is emphasizing retention of large trees. And those guidelines are also in the record. Is that what's behind this concern about 7.9 versus 8.0? No, Your Honor. I think the concern about 7.9 versus 8.0 is with the identification of whether a stand is old growth or not. And that number is one factor. It's the number of ‑‑ that number reflects the number of live trees in the stand, live large trees. Well, with respect to the marking, is there anything in the record which would indicate that some trees that were marked for logging were indeed old growth? Well, Your Honor, that ‑‑ the premise behind that question is incorrect, because old growth is not individual trees. And so there cannot be trees that have been marked to be cut that are, quote, unquote, old growth. There are trees that there will be ‑‑ Help us understand. I think, just so we can get ‑‑ I have the same question as Judge O'Scanlan. Okay. When they go to a stand to assess whether or not, under the green article criteria, whether it should be designated as an old growth habitat, okay, are they looking at old growth trees within that stand? They're looking at multiple factors. But I understand there are multiple factors. Yes. But is one of them that they're looking for what would be considered an old growth tree by size and age? Yes. They're looking for trees of a particular age, trees of a particular size. Okay. So if the Forest Service, applying its criteria, multiple criteria, decides that, notwithstanding there are old growth trees within the stand, and they don't meet the sufficient number to cause Forest Service to designate it as an old growth habitat, I understood counsel to be arguing, A, he thinks that was misapplied, it should have been designated old growth habitat, even if it wasn't. I'm taking it to the next step. Even if it was an old growth habitat, there are still old growth trees within that stand. Is that a fair understanding? Your Honor, those trees would be better termed large old trees. All right. Large old trees. Yes. And those trees will be retained. They will be. Okay. So anything that would, under counsel's approach, would have, in his labeling, be called old growth trees, if I understood him correctly, are, under your labeling, large trees because you get large by being older, right, at least in tree world, and therefore they have not been marked for logging. Correct. Okay. Those trees will be retained. There's an emphasis that is repeated throughout the record of decision that large trees will be retained and the characteristics of old growth habitat will be retained so that these stands. Even if it's not an old growth habitat. Correct. So the treatments that are occurring under the project will not preclude stands from in the future becoming old growth habitat. Mr. Woodbury seems to be concerned that some loggers might nevertheless cut these trees. Does the Forest Service supervise the actual logging so that they would be able to spot a logger taking down the wrong tree? Yes. The Forest Service monitors what's happening in the forest. On the soil matter, I understood there were some restrictions on seasons and equipment to protect the fragile parts of the soil. Is that correct? That is correct, Your Honor. And in fact, the cumulative impacts analysis, which the Forest Service did not ignore here, as Wild West asserts, but in fact took into account and used the cumulative impacts analysis to determine whether an area should be ground-based harvesting or helicopter harvested or skyline harvesting based on potential disturbance already in the area. Do they use highland skyline type harvesting in this area, the ones in controversy here? Your Honor, there will be some skyline harvesting. I believe about 64 percent of the project is going to be helicopter harvested. I believe that there won't be any summer ground-based harvesting because that is more disturbance than other types of harvesting. So the Forest Service certainly took that into account and has mitigated soil disturbance to the extent possible. Kelsey, you're down to about seven three-quarter minutes. I'm just reminding you you were going to share time. I'd like to make one comment on the species viability issue. Since there was issues about population monitoring raised in the reply brief that we haven't had an opportunity to respond to, I just want to make the point that the Forest Service has complied with its obligations here. The analysis that the Forest Service did with respect to the pileated woodpecker, the black-backed woodpecker in the northern goshawk, is very similar to the type of analysis that this Court found sufficient in Native Ecosystems Council versus the United States Forest Service as well as Idaho's Sporting Congress versus Thomas. We've looked at the record on those sites. And with that, if the Court has no further questions, I will sit down. Thank you. Thank you, Counsel. May it please the Court? My name is Julie Wise and I represent the intervener appellees. Ms. Wise? The Court may recall that the interveners in this case are a coalition of public and private individuals and entities who live in and around the East Fork community. They live and work in this area. Because this is where they live and where they work, interveners are particularly concerned that this project proceed to completion, not only for their own protection but also for the protection of their neighbors, for the protection of property, private property, and for the protection of public natural resources. Interveners understand that Wild West is passionate about protecting the environment. Interveners are likewise passionate about protecting their own property, their own safety, and this is a case that is very important to interveners. I would like to jump right to the issues that have been before this Court regarding old growth and then touch briefly on a soils issue. On the old growth issue, turning to Wild West's brief at page 18, this is the reply brief. Wild West writes that in Unit 6, stand number 39201011 had its old growth designation removed because surveyors found only 7.97 live large old growth trees instead of eight. That was the example that Mr. Woodbury started out with. Now, we have to dig into the record to understand what actually went into a determination as to whether or not this particular area of the forest was considered old growth habitat. And it is a bit cumbersome to go through these records. Mr. Woodbury is absolutely right that they sometimes can be rather complicated. But I would first take your honors to SER, the supplemental excerpts of record at 1283. 1283 is an example of some of the information that is in the record. At 1283, we see that for Unit 6, stand number 39201011, this stand was examined three separate times. It got a CSE, that's a common stand exam. It also underwent a civil cultural diagnosis. And it also went a civil cultural prescription. So these were the examinations that were given to that particular stand. This is only one of several stands, many stands in this particular unit. What are they looking for when they examine? Are they looking for old growth criteria? Well, Your Honor, let's turn to SER 1178. And we can see some of the things that the Forest Service is looking at. Because at 1178, what we see is that for that same stand, eight separate plots, this is one stand in one unit, eight separate plots were examined for the number of live old trees. And so we have data on that, and that's where we get the 7.97 large trees, which was below the minimum requirement. But that's not all, Your Honor. Below by 0.3. That's right. But that's not the only thing that the Forest Service looked at. Let's turn to SER 1166. This is a stand diagnosis matrix for this same stand. This is Unit 6 in Management Area 2. And now we see some of the other criteria that the Forest Service looked at. The existing condition is described. It's Doug Fir, overstory with limited Ponderosa pine on east aspects, plus some Engelman spruce. Judge Goodwin was asking about the species that are there. Well, here we have this information. We see the bark beetle is active, evidence of new hits. There's plenty of information in here. And this is only for one unit, Your Honors. For each of these units and for individual stands, the Forest Service went through and did common stand exams, silvicultural diagnoses, walk-through exams, statistical analyses of the features set forth in green to determine whether or not this is old growth habitat. This is not simply going out, selectively picking a place where there are no trees, throwing a plot down, and counting the number of stems. It's much more complicated than this. And this is exactly the sort of analysis that courts have determined should be we should refer to the Forest Service because it is an expert in these sort of determinations. These are not easy determinations, Your Honors. And that is just one example of why you should not accept Wild West's assertion. It's simply because that particular stand that he picked out of all of the others looked like it was close to the old growth habitat criteria, and therefore this was an abuse of discretion or, excuse me, arbitrary and capricious. The Forest Service was not arbitrary and capricious. Now, on the soils issue, Your Honor, Mr. Woodbury talks about the fact that in areas that have 15 percent detrimental disturbance, this is a threshold that the Forest Service should not be allowed to enter, to go into those areas once that level is met. Mr. Woodbury is very concerned that somehow the cumulative soil impacts have been overlooked in this project. The district court was correct in concluding that the cumulative soils analysis is in this EIS. We see it in the EIS at pages SER 662 through 676. And we actually see that cumulative soil impacts by sub-watershed analysis, the very thing that Mr. Woodbury complains is not in this EIS, that is found at SER 563 through 570. The Forest Service put it in a slightly different format from the draft EIS to the final EIS. It actually expanded the analysis. And it is certainly there in the analysis. And it is very important to understand that the Forest Service is not prohibited from entering into a unit that is in excess of 15 percent detrimental disturbance. In this case, the Forest Service dropped all units that had more than 15 percent detrimental disturbance. But that is unfortunate because that is the only way, entering those units, that the If you look at the record, Your Honors, you will see, for example, in numerous places, that it is important to actually enter into the units that are in excess of 15 percent detrimental disturbance and restore them. There is no prohibition on entering those areas. And if you have a watershed that is actually in excess of 15 percent, one of the ways that you can achieve restoration of the watershed, which is one of Mr. Woodbury's big concerns, is by actually, in the process of performing projects, to go into those particular units and to restore them, to do things like ripping the soil. And you can actually improve the condition of the soil. So, Your Honor, we agree that Mr. Woodbury, that Wild West has actually waived all of the procedural claims that were not fully briefed before the district court. They were simply asserted. The Region I soil quality standard, that facial challenge, is not before this Court. If, for some reason, the Court wanted to look at the facial challenge to the Region I soil quality standard, we would refer you to the record, which is replete with evidence that the 15 percent detrimental soil threshold is a very good way to protect soils. And we could refer you to SCR 1031-32. All right. Thank you. Thank you, Counsel. Your time has expired. The case just argued will be submitted for decision, and the Court will adjourn. Thank you. All rise. The Court will discuss the penitentiary.
judges: Goodwin, O'scannlain, Fisher